## CENTRAL OF GEORGIA RAILWAY COMPANY v. AUGUSTA BROKERAGE COMPANY, and vice versa.

1. The rule promulgated by the railroad commission of this State, that carriers "in the conduct of their intrastate business shall afford to all persons equal facilities in the transportation and delivery of freight," prohibits discrimination against shippers, not against commodities.

(a) As to issuing through bills of lading or furnishing its cars to connecting carriers, in order that shipments may be carried to ultimate destination without reloading at terminal points, a carrier may discriminate against cottonseed, provided all shippers of that commodity are treated alike.

(b) That such discrimination is dictated by the business interests of the carrier and really affects but a single shipper, because he is the only person at a terminal point who is engaged in shipping cottonseed out of the State, can not alter the matter.

(c) The carrier may at any time change its policy as to furnishing shippers of a certain commodity privileges which, under the law, it is not bound to extend to them.

(d) That a case on trial has been before the Supreme Court and that court has held that the plaintiff's petition sets forth a cause of action, is of no concern to the jury; nor should they be instructed as to the law upon abstract propositions wholly disconnected with the issues of fact they are called on to determine.

2. The operation of Rule 36 of the railroad commission of Georgia is, by its own terms, limited to intrastate shipments; and unjust discrimination against shippers engaged in interstate commerce, as to the matter of issuing through bills of lading or furnishing reshipping facilities at terminal points within this State, does not constitute a violation of that rule.

3. Where a plaintiff sues to recover punitive damages for a particular wrongful act, and relies, as evidencing the animus with which that act was committed, upon the commission of a wholly independent act, done at a different time and place, the defendant should be advised by the plaintiff's pleadings of the case he is expected to meet.

Argued March 9,—Decided March 27, 1905.

Action for damages. Before Judge Eve. City court of Richmond county. January 21, 1905.

*Lawton & Cunningham* and *J. C. C. Black*, for Central of Georgia Railway Company. *William H. Fleming*, contra.

EVANS, J. When this case was before this court on a former occasion, it was held that the plaintiff's petition set forth a cause of action, and that the special demurrers urged against it were not well taken. 121 *Ga.* 48. A trial upon the merits was had in the court below, and resulted in a verdict for $3,005 in favor of the plaintiff. A motion for a new trial, presented in behalf of the defendant railway company, was overruled, and it excepted. By a

cross-bill of exceptions the plaintiff brings under review various rulings made during the progress of the trial, which were adverse to it.

1. The gravemen of the brokerage company's complaint was that the railway company had, in violation of a rule promulgated by the railroad commission of this State, providing that carriers, "in the conduct of their intrastate business, shall afford to all persons equal facilities in the transportation and delivery of freight," wrongfully refused to place a car loaded with cottonseed on a side-track in the rear of its warehouse, refused to allow reshipment of its cars at Augusta, and that the company's refusal so to do was in pursuance of a predetermined plan to drive the plaintiff out of the business of buying cottonseed at points along the railway company's line of road. As evidencing that such was the purpose of the railway company, the plaintiff alleged that it had also refused to issue through bills of lading from a station in Burke county to points beyond its line, notwithstanding the common practice of the railway company was to issue such bills of lading to other patrons. The evidence, however, disclosed that the railway company, while issuing through bills of lading on shipments of general merchandise, declined to do so on shipments of cottonseed, and in this respect there was no discrimination against the plaintiff. It further appeared that although the plaintiff had asked that a through bill of lading on a shipment of cottonseed at the Burke county station should be issued to one of two points in Georgia beyond the railway company's line, the request was not made in good faith and the plaintiff would not have accepted the bills of lading if the railway company had signified its willingness to issue them. The trial judge nevertheless instructed the jury that should they believe the defendant company discriminated against the plaintiff as to issuing through bills of lading on intrastate shipments, this would be a violation of Rule 36 of the railroad commission, and the plaintiff would be entitled to recover such damages as resulted, and the jury could visit upon the railway company exemplary damages if they found its refusal to issue to the plaintiff through bills of lading was willful. The court further instructed the jury as follows: "If it is the common practice of a railroad company to allow reshipping privileges or through bills of lading for all classes of merchandise generally, it can not arbi-

trarily select any one class of merchandise and refuse such privileges to dealers in that class of merchandise.    In order to justify such discrimination, there would have to be differences in the circumstances and conditions of shipment." These and other instructions of similar import are excepted to on the ground that they were not authorized either by the law or the evidence, and were highly prejudicial to the railway company. The first of these instructions certainly ought not to have been given. The plaintiff was not suing for damages resulting from the refusal of the railway company to issue a through bill of lading from the station in Burke county; the plaintiff could not, in the city court of Richmond county, recover damages for a tort committed in Burke county; and, moreover, had the plaintiff sued in the latter county, no recovery of damages because of such refusal would have been authorized, for the evidence shows that the application for a through bill of lading on an intrastate shipment was not bona fide. The plaintiff really wanted a through bill of lading to some South Carolina point.    Had the railway company issued through bills of lading to other shippers of cottonseed at the Burke county station, but declined to accord like privileges to the plaintiff, this fact would, as was held when this case was here before, afford competent evidence touching the alleged purpose of the railway company to break up the plaintiff's business.    However, the plaintiff failed to establish any such unjust discrimination, and therefore what occurred at that station really had no bearing on the case, unless the court was right in the view of the law expressed in the charge which we have above quoted.

The rule of the railroad commission alleged to have been violated prohibits discrimination against shippers, not against commodities; all shippers of a given commodity must be treated alike, but the carrier is not bound to have fixed and unvarying rules applicable alike to each and all kinds of freight, or to any given class of freight when shipped in car-load lots.    In the first place, it was optional with the railway company whether or not it would adopt the custom of issuing any through bills of lading or delivering its cars at Augusta to connecting carriers in order that freight might, without reloading on cars furnished by them, be reshipped in bulk. *Coles* v. *Central Railroad Co.*, 86 *Ga.* 251.    It could, without committing itself to any duty of so handling raw

commodities, issue through bills of lading or afford such reshipping facilities to shippers of manufactured articles or any other kind of freight it might choose to handle in that way. In the absence of any duty imposed by law, it could even arbitrarily so conduct its business in this respect as to discriminate between cottonseed and grain, lumber, or other products. Counsel for the railway company very frankly concede that it had a "policy" which governed its decision in not issuing through bills of lading on shipments of cottonseed from points along its line or allowing facilities at Augusta for the reshipment of that product in bulk over competing lines. This policy was doubtless a purely selfish one, inasmuch as the railway company looked to its own material business interests rather than to those of the plaintiff or other brokers engaged in handling cottonseed. But the plaintiff also had a "policy;" it was not a philanthropic one. The situation may thus be summarized: The oil mills at Augusta depended largely for a supply of cottonseed upon the territory through which ran the defendant railway company's line; they delivered to it their manufactured products for shipment; so the railway company got a short haul on the raw cottonseed, and also a long haul on the reshipments made over its line of the manufactured products. It was not to the business interests of the railway company that cottonseed grown at local stations on its Augusta and Savannah branch should be shipped to oil mills located in South Carolina; for none of the manufactured products could then be secured for reshipment, at a high rate, over its road; its interests dictated that the cottonseed should stop at Augusta and be manufactured into oil and by-products by the mills located at that point. The railway company therefore determined that it would not, by voluntarily granting facilities to shippers which it was under no legal duty to afford, supply the means of diverting from its road profitable shipments which it otherwise would receive. On the other hand, the material business interests of the brokerage company demanded that it should be granted such facilities. It was a free lance, in open competition with the oil mills at Augusta in the buying of cottonseed at the lowest price possible, and all the seed purchased by it was shipped from Augusta over the Southern Railway to South Carolina mills. To reload shipments at Augusta for the South Caro-

lina trip was expensive; to get through bills of lading, or to secure the consent of the defendant company that its loaded cars be delivered to the Southern Railway at Augusta so that the seed might be carried to its ultimate destination without reloading, would render the business of the brokerage company profitable, the business of the Augusta oil mills less remunerative. Their interests and those of the defendant railway company were coincident; its interests and those of the brokerage company conflicted. The railway company acted as the average business man would have done; that is all. In declining to grant the privileges which the brokerage company wished to enjoy, the railway company merely adopted a policy which was within its legal rights as a carrier. *State* v. *Railroad Co.*, 104 *Ga.* 437. That the brokerage company may have been the only broker in Augusta or elsewhere affected by this policy can not alter the case. As a shipper, it was not discriminated against, though one of the commodities it handled was, incidentally. The railway company had the undoubted right to refuse to make through shipments of any freight or permit its cars to leave its line of road, however they might be loaded. To compel it to adopt a policy whereby no discrimination against a particular commodity would result would not necessarily benefit the brokerage company, but might react to its disadvantage and be inimical to the interests of shippers of other commodities; for it would then be within the power of the carrier to decline to deliver its cars for carriage over other lines under any circumstances. It may be that for this reason our railroad commission has not deemed it wise to attempt to prohibit any discrimination between different commodities, belonging to a general class of freight.

If, as the evidence discloses, none of the patrons of the defendant company were granted the privilege, at Augusta, of having shipments of cottonseed in its cars turned over to connecting lines for transportation in bulk without reloading, then the plaintiff is not entitled to recover damages because of the railway company's refusal to accord it this privilege, and the evidence bearing upon the "policy" of the carrier in this regard was not competent for the purpose of sustaining the plaintiff's contention that the purpose of the defendant was to drive it out of business. Animus can not be inferred from what one does while acting

strictly within his legal rights. That during the previous cotton season the carrier had granted the privilege sought by the brokerage company can not affect the matter at all. The carrier could change its policy at any time it saw fit, and the plaintiff had timely notice of its intention to withdraw this privilege at the close of that season.

What is said above disposes of a number of assignments of error made upon the charge of the court, and also of exceptions taken to the refusal of the court to give in charge pertinent requests which were in accord with the law as herein announced. The only contention of the plaintiff which the evidence tended to sustain was that the defendant had wrongfully refused to place a car loaded with cottonseed on the side-track in the rear of plaintiff's warehouse, and that the purpose of the railway company in refusing to do so was to put the plaintiff to unnecessary expense in reloading at a different place and thus discourage its engaging in the buying and shipping of cottonseed. There was proof of aggravating circumstances attending this discrimination against the plaintiff and in favor of the local oil mills, and the jury were warranted in reaching the conclusion that the conduct of the railway company was willful and in pursuance of a predetermined plan to throw every obstacle in the way of the plaintiff to prevent shipment of seed into South Carolina. But the case was not fairly or correctly presented to the jury, and a new trial must result.

At the request of plaintiff's counsel, the court informed the jury that in a decision on one branch of this case, the Supreme Court had settled the law of it in favor of the plaintiff, holding that if the plaintiff sustained by evidence the allegations of the declaration as to the conduct of the railway company with regard to intrastate business, the plaintiff would be entitled to recover. Complaint is made of this instruction, on the ground that it was prejudicial to the defendant, in that it conveyed the impression to the jury that the Supreme Court had practically decided the case against the defendant, and it had no valid defense. Suffice it to say that the charge was at least irrelevant to any issue before the jury and could serve no legitimate purpose in their determination of the case. Two other instructions are justly complained of as being inapplicable to the facts of the case, and

therefore inappropriate and misleading. One was to the effect that while it was no proper business of a common carrier to facilitate particular enterprises or to build up new industries, yet, as the carrier depended for its very existence upon the will of the people, it was bound to deal fairly with the public, furnish reasonable transportation facilities, and put all of its patrons upon an absolute equality. The other instruction was as follows: " A railroad company can not discriminate in favor of a shipper who is able to furnish a large amount of freight over one engaged in the same business who is unable to furnish the same quantity — at least, where both ship in car-load lots."

2. Another question presented for determination, both by the main bill and the cross-bill of exceptions, is whether or not the court correctly interpreted and presented to the jury the meaning and effect of Rule 36 of the railroad commission, in so far as interstate shipments were concerned. The operation of that rule is, by its own terms, limited to intrastate shipments, and therefore can not be held to apply to shipments originating in this State but destined for points beyond its borders. A bill of lading issued from a station in Georgia to one in South Carolina would evidence an interstate shipment, whether it was to be carried all the way by the initial carrier, or was to be delivered by it at some intermediate point to a connecting carrier for transportation to ultimate destination. The ultimate destination of a shipment, intended to take one continuous journey, would determine its character in this respect. Facilities afforded for carrying through a cargo in bulk, without reloading at an intermediate point, would attach, according to the circumstances, to either interstate or intrastate commerce. A failure to afford equal facilities to all shippers engaged in interstate commerce would not be a violation of Rule 36. The instructions of the court to this effect were correct, but might properly have been more specifically applied to the facts by giving the request to charge on this subject presented by counsel for the railway company. The plaintiff appears to have been engaged altogether in making interstate shipments of cottonseed, no delivery being made to the plaintiff in Augusta except for the purpose of reloading on Southern Railway cars, in order that the seed might make one continuous journey from Georgia into South Carolina.

3. The plaintiff in its petition complained of a refusal by the railway company, on December 9, 1903, to deliver one car of cottonseed on a side-track in the rear of the plaintiff's warehouse, and for this alleged tort both actual and punitive damages were claimed.    At the trial the plaintiff offered to prove that, shortly before and shortly after that date, the defendant refused to deliver other car-load lots of cottonseed on that side-track, the evidence being offered, counsel announced, for the purpose of proving plaintiff's contention that the defendant had a predetermined plan to drive plaintiff out of the cottonseed business, and for the further purpose of showing aggravating circumstances.    Upon the objection of the railway company that the plaintiff had not alleged any of these matters of aggravation, the court excluded the evidence.    The plaintiff also offered to prove by a witness that about January 12, 1904, he had seen certain bills of lading covering shipments of cottonseed from Midville, Ga., to Manning, S. C., issued by the defendant to Allan W. Jones, in whose name the shipments had been made, although the seed was the property of the brokerage company.    On the ground that the bills of lading were the best evidence of what were their contents, this testimony was excluded.    Plaintiff then attempted to prove by the same witness that these shipments came through Augusta, and witness knew of his own knowledge that the cottonseed was not there reshipped or transferred to other cars, and had duly reached Manning, S. C.    Counsel stated that the purpose of the testimony was to show that through bills of lading must have been issued, for otherwise the shipment could not, without reshipment at Augusta, have reached Manning, S. C.    The defendant objected to the introduction of this testimony, and the court excluded it on the ground that it related to transactions which took place after the filing of the suit.    To all of these rulings exception is taken in the cross-bill.    Each of them was, we think, correct.

" The assessment of damages is usually governed by the situation or condition of affairs existing at the time the action is brought."    13 Cyc. 177.    The general rule as to the recovery of special damages is, where they are not such as naturally flow from the wrongful act complained of, that " it is necessary, in order to prevent surprise to the defendant, that the declaration state specifically and in detail the damages sought to be recov-

ered," which involves making a statement of the facts upon which the plaintiff relies for a recovery thereof. Id. 176. Where "a wilful wrong is committed, evidence of matters tending to aggravate the damages, when necessarily or legally arising from the act complained of, is admissible without special averment." Id. 175–6. But it is apparent that where a plaintiff sues for a given wrongful act, and relies, as evidencing the motive with which that act was committed, upon another wholly independent act at a different time and place, the defendant should be advised by the plaintiff's pleadings of the case he is expected to meet. A case bearing directly upon this proposition is that of Leavitt *v.* Cutler, 37 Wis. 46, which was a suit for damages because of a breach of a contract of marriage. The court held: "In such an action the fact that the plaintiff has been seduced by defendant by means of the alleged promise of marriage may be shown, to enhance the damages, if it is alleged in the complaint, but not otherwise." See also Klopfer *v.* Bromme, 26 Wis. 372, 376. In the present case, the defendant company could hardly have been expected to be prepared to meet charges that, after suit was commenced, it had committed certain specific acts which were wrongful and which tended to prove that the acts complained of in the petition were wilfully committed; nor was the defendant put upon notice that the plaintiff would attempt to prove, as an aggravating circumstance, that on given occasions prior to the commencement of the action the defendant had wrongfully refused to place on plaintiff's side-track cars other than the one described by number in the petition. Had the plaintiff undertaken to amend its pleadings, the defendant could have claimed surprise; certainly the testimony offered was not admissible under the pleadings as they stood.

*Judgment on main bill of exceptions reversed; on cross-bill affirmed. All the Justices concur.*