## 1262.  AUGUSTA BROKERAGE COMPANY v. CENTRAL. OF GEORGIA RAILWAY COMPANY.

1. The fact that the owner of merchandise, which is offered to a carrier for transportation from one point to another in the same State, intends to have it further transported by a second carrier into another State does not make such first transportation interstate commerce, even though such first carrier may be informed of the ultimate destination of the merchandise.

2. The intention of the consignee as to the future disposition of his property by shipping it over another line, under a new bill of lading, into another State can not change an intrastate shipment to an interstate shipment. The law is dealing, not with the intention of the consignee,. but solely with the relation of the carrier to the freight transported.

3. In so far as the plaintiffs' case rested upon the alleged violation of rule 36 of the Railroad Commission of Georgia, with respect to the defendant's refusal to issue to the plaintiffs through bills of lading, or to furnish its cars to connecting carriers in order that shipments might. be carried to ultimate 'destination without reloading at terminal points,. there has been a definite and positive adjudication against their right of recovery, in the decision of the Supreme Court in the case of *Central of Georgia Railway Co.* v. *Augusta Brokerage Co.*, 122 *Ga.* 646 (50 S. E. 473, 69 L. R. A. 119), which, as to these features, is the final law of the case. Not so, however, with respect to that portion of the plaintiffs' case complaining of a failure of the defendant to place cars upon the plaintiffs' warehouse side-track. That much of the plaintiffs' case remains intact, and the evidence upon that point should have been submitted to the jury.

Action for damages, from city court of Richmond county— Judge Eve.  June 19, 1908.

Submitted July 17,—Decided November 11, 1908.

Judge Seabrook sat in the place of Judge Powell, disqualified.

*William H. Fleming,* for plaintiff in error.

*Lawton & Cunningham, James C. C. Black,* contra.

SEABROOK, J.  In the court below a verdict was directed against the plaintiffs.  They filed their motion for a new trial, and it was. overruled.` To the judgment overruling this motion the plain-- tiffs except.  To determine whether the judgment overruling the· motion for a new trial was proper, we must consider whether. the direction of the verdict by the court was proper; for if the ruling in the latter instance was right, necessarily the former ruling was right.  It is necessary, therefore, that we review somewhat at length the history of this case.  It seems from the record that the Augusta Brokerage Company was engaged in buying cottonseed

in car-load lots, along the line of the defendant's railway in this State, in competition with the oil mills in Augusta, and shipping them to parties in South Carolina, over the Southern Railway. The real controversy has been succinctly summarized in the body of the opinion in the case of *Central of Ga. Ry. Co.* v. *Augusta Brokerage Co.,* 122 *Ga.* 649, as follows: "The oil mills at Augusta depended largely for a supply of cottonseed upon the territory through which ran the defendant railway company's line; they delivered to it their manufactured products for shipment; so the railway company got a short haul on the raw cottonseed, and also a long haul on the reshipments made over its line of the manufactured products. It was not to the business interests of the railway company that cottonseed grown at local stations on its Augusta and Savannah branch should be shipped to oil mills located in South Carolina; for none of the manufactured products could then be secured for reshipment, at a high rate, over its road; its interests dictated that the cottonseed should stop at Augusta and be manufactured into oil and by-products by the mills located at that point. The railway company therefore determined that it would not, by voluntarily granting facilities to shippers which it was under no legal duty to afford, supply the means of diverting from its road profitable shipments which it otherwise would receive. On the other hand, the material business interests of the brokerage company demanded that it should be granted such facilities. It was a free lance, in open competition with the oil mills at Augusta in the buying of cottonseed at the lowest price possible, and all the seed purchased by it was shipped from Augusta over the Southern Railway to South Carolina mills. To reload shipments at Augusta for the South Carolina trip was expensive; to get through bills of lading, or to secure the consent of the defendant company that its loaded cars be delivered to the Southern Railway at Augusta so that the seed might be carried to its ultimate destination without reloading, would render the business of the brokerage company profitable, the business of the Augusta oil mills less remunerative. Their interests and those of the defendant railway company were coincident; its interests and those of the brokerage company conflicted." Upon this state of facts the Supreme Court held: "As to issuing through bills of lading or furnishing its cars to connecting carriers, in order that

shipments may be carried to ultimate destination without reloading at terminal points, a carrier may discriminate against cottonseed, provided all shippers of that commodity are treated alike. That such discrimination is dictated by the business interests of the carrier and really affects but a single shipper, because he is the only person at a terminal point who is engaged in shipping cottonseed out of the State, can not alter the matter." In the body of the decision, referring to the refusal to issue through bills of lading, or to consent that its loaded cars be delivered to the Southern Railway at Augusta, that court further says (p. 650) : "The railway company acted as the average business man would have done;" and, "in declining to grant the privileges, which the brokerage company wished to enjoy, the railway company merely adopted a policy which was within its legal right as a carrier. *State* v. *Railroad Co.,* 104 *Ga.* 437 [30 S. E. 891]. . . The railway company had the undoubted right to refuse to make through shipments of any freight, or to permit its cars to leave its line of road, however they might be loaded."

Hence it will be seen that in so far as the plaintiffs' case rested upon the alleged violation of rule 36 in the two respects referred to, there has been a definite and positive adjudication against them; and this court is bound by such adjudication. But this is by no means all of the plaintiffs' case. In their declaration they allege that rule 36 was violated by the defendant in another respect, and that such violation resulted in damage to them. They say, that it is a common practice of the defendant railway company to make delivery of car-load lots of cottonseed to the warehouses of the cottonseed-oil mills at Augusta, having tracks connected with the tracks of the defendant; that in September, 1903, the plaintiffs shipped to Augusta from Green's Cut, Georgia, a station on the line of the defendant's road, car No. 4769 loaded with cottonseed, and, when said car arrived at Augusta, a member of the plaintiffs' firm presented to the proper officer of the defendant the bill of lading, and requested that the car be delivered on the side-track of the plaintiffs' warehouse. This request was refused; and it is claimed that such refusal was a denial to the plaintiffs of "equal facilities in the transportation and delivery of freight," and was "an unjust discrimination" against them, in violation of rule 36 of the Railroad Commission of Georgia; and that in con-

sequence of the defendant's failure to deliver the car-load of cottonseed, the plaintiffs were put to the expense of five dollars, which sum is claimed as actual damages. It is further claimed that this refusal was a part of a premeditated plan to drive the plaintiffs out of the business of buying cottonseed; and it is characterized as a wilful violation of law, which renders the defendant liable for exemplary damages. By reference to the 31st Annual Report of the Railroad Commission of Georgia, it is discovered that the rules have been amended and rearranged, and that rule 36 is now rule 2, and that the language of this rule has been changed (see page 20). It appears, however, that rule 36 was in force when this controversy arose. The material portion of this rule reads as follows: "The several railroad companies in this State, in the conduct of their intrastate business, shall afford to all persons equal facilities in the transportation and delivery of freight, without unjust discrimination in favor of or against any; and wherever special facilities are afforded to one shipper in the transportation or delivery of freight in car-load lots or less, whether upon a special rate authorized by this commission, or otherwise, such company shall be bound to afford to any other shipper or shippers, under substantially similar circumstances, like facilities upon like rates." It will be observed that this rule applies, not to interstate, but to intrastate business only. It is necessary, therefore, in determining whether the plaintiffs' complaint is properly laid, to ascertain the character of the shipment in car No. 4769 in this respect, and see if it falls within the operation of rule No. 36 of the Railroad Commission of Georgia.

The plaintiffs were avowedly buyers of cottonseed for South Carolina parties. It is admitted that the cottonseed they bought was intended ultimately to be shipped to South Carolina; and presumably their request that this car be placed on the side-track at their warehouse was intended in some way to facilitate shipment to its ultimate destination in South Carolina. But the intention of the consignee as to the future disposition of his property by shipping it over another line, under a new bill of lading, into another State can not change an intrastate shipment into an interstate shipment. The law is not dealing with the intention of the consignee, but solely with the *relation of the railroad* to the freight transported. A seller in Georgia might conduct with a buyer in

South Carolina an interstate business as between themselves; but if the railroad refuses to carry beyond its own line, and compels unloading at its terminus in Georgia, such business in its relation to the railroad is wholly intrastate. "Business done within this State can not be made to mean business done between this State and another State." Pacific Express Co. *v.* Seibert, 142 U. S. 350 (12 Sup. Ct. 253, 35 L. ed. 1035). "The fact that the owner of merchandise, offered to a carrier for transportation from one point to another in the same State, intends to have it further transported by a second carrier into another State does not make such first transportation interstate commerce, or render the carrier subject to the control of the commission in respect to it, even though such first carrier *may be informed* [italics ours] of the ultimate destination of the merchandise." Mo. & Ill. R. Co. *v.* Cape Girardeau R. Co., 8 I. C. C. Rep. 96. We think. the expression used by the Supreme Court in the case of *Central of Georgia Ry. Co.* v. *Augusta Brokerage Co.,* supra, that "The plaintiff appears to have been engaged altogether in making interstate shipments of cottonseed," etc., can only be true in the sense that the owner was in Georgia and the buyer in South Carolina, and can not be true in respect to the defendant railroad's relation to the contract. It appears that when using this expression the court had in mind the refusal of the defendant railroad company to deliver its cars to the Southern Railway, and not the refusal of the defendant railroad company to place its loaded cars on the side-track at the plaintiffs' warehouse. Briefly stated, the Supreme Court did not decide that the shipment of cottonseed from Green's Cut, or elsewhere in Georgia, to Augusta was interstate business, even though, after being unloaded into the plaintiffs' warehouse, it was intended to be reloaded into other cars for shipment to points in South Carolina. Hence what we here rule is not in conflict with the decision of that court.

There being some evidence tending to show that it now is and for years past has been the common practice of the defendant railroad company to deliver cars of cottonseed upon the side-track of the oil mills at Augusta, and to other parties; and further, that notwithstanding the plaintiffs had a side-track of standard gauge, alongside their warehouse, connected with the defendant's line of railway at Augusta upon which delivery of a

car-load of cottonseed consigned to them was requested by the plaintiffs and refused by the defendant, it follows that such a refusal was a denial to the plaintiffs of "equal facilities in the transportation and delivery of freight," and was "an ·unjust discrimination" against the plaintiffs, in violation of rule 36 of the Railroad Commission of Georgia. The evidence on this branch of the case should have been submitted to the jury, for their determination, under appropriate instructions by the court. It follows, therefore, that the direction of the verdict was error.

*Judgment reversed.*

Russell, J., dissenting. Personally I am glad that the judgment of the majority of the court affords a means by which the plaintiffs in error can sustain a verdict against the defendant. Judicially I can not concur in that judgment. I expressed our personal view in the opinion when the same case was heretofore before this court (*Central of Georgia Railway Co.* v. *Augusta Brokerage Co., 2 Ga. App.* 511, 58 S. E. 904) ; but, after a very mature consideration of the evidence then, we could not see how to escape the effect of the decision of the Supreme Court (122 *Ga.* 646). We were bound to declare the law, not according to our views, but according to the prior adjudication. There has been no change in the evidence since the case was here before. By agreement of counsel, on the trial now under review the approved brief of evidence on the former trial was read to the jury, in lieu of the testimony being again delivered by the witnesses.

To my mind, nothing is more obnoxious legally than a monopoly. In my view, nothing should be less encouraged than a policy which, by the destruction of competition, must necessarily create a monopoly either in trade or in transportation. In my opinion, the facility with which monopoly can, under existing conditions, be created is so much greater than ever, that neither the law as to the offenses defined by Blackstone, in volume 4, chapter 12, of his Commentaries, nor the Roman law upon similar subjects, is adequate to deal with the existing situation. It is not material to this discussion to say whether the effect of the line of conduct would be to create a monopoly in cottonseed in the hands of the oil mills· at Augusta or not. As said by Justice Bradley in the case of Butchers Union Co. *v.* Crescent City Co., 111 U. S. 761 (4 Sup. Ct. 656, 28 L. ed. 585), "I hold it to be an incontroverti-

ble proposition of both English and American public law, that all mere monopolies are odious and against common right. . . Monopolies are the bane of our body politic at the present day." And, as said by Justice Brown in the case of Pearsall v. Great Northern Ry. Co., 161 U. S. 676 (16 Sup. Ct. 714, 40 L. ed. 838), "the logical effect of all monopolies is an increase of price of the thing produced, whether it be merchandise or transportation." However, if the decision of the Supreme Court in *Central of Ga. Ry. Co.* v. *Augusta Brokerage Co.,* supra, means anything, it means that the Central of Georgia Railway Company, as a common carrier, had the right to establish and maintain a policy, as to cottonseed at Augusta, by which it would receive the benefit of the profit accruing from their transportation away from Augusta, and that it was not required to afford *any facility* to those who would contravene its policy or render it less effective. This was held not to be discrimination against a *shipper,* but against a *commodity,* and was distinctly ruled to be permissible, by this unequivocal declaration of the law. There is no evidence in the record that the plaintiffs were discriminated against, even if their cottonseed were. The evidence is uncontradicted that the railway company placed cars at the plaintiffs' warehouse, for grain, hay, lumber, or any other product except cottonseed. We are all agreed that the plaintiffs can not recover for the refusal of the carrier to issue through bills of lading beyond its terminus. Indeed the Supreme Court in this case was not by any means announcing this principle for the first time, and it is only incidental. The point on which we differ, in my opinion, is the axis around which this whole case revolves. The crux of the whole matter is the refusal of the railway company to place a car—No. 4769, loaded with cottonseed, at the plaintiffs' warehouse, so as to make it easier for the plaintiffs to defeat the policy which the railway company had established, and which the Supreme Court, in *Central Ry. Co.* v. *Augusta Brokerage Co.,* supra, has expressly sanctioned, as not being discriminatory. In other words, under the decision of the majority of this court, the plaintiffs are permitted to recover damages for the refusal of the railroad company to afford them a facility for defeating a policy which the Supreme Court says the defendant has the right to maintain. I grant that there is evidence in the record that the defendant company placed cars of cottonseed at the

13

warehouses of the *cottonseed-oil mills,* but I reiterate the statement contained on page 514 of the opinion in 2 *Ga. App.,* that "the plaintiff proved the discrimination, but did not prove that any commodity was discriminated against except *cottonseed.*" There is, so far as I can discover, no rule of the Railroad Commission which requires a carrier to deliver a loaded car at a private sidetrack of a consignee. The evidence is undisputed that such placing of a car of cottonseed involved expense to the railway company, and effected a saving of at least $2.50 to the dealer in cottonseed; that without this, the Augusta Brokerage Company could not prevail in the effort to ship seed away from Augusta; and unless the railway company was forced to render this gratuitous assistance to its adversary, it could successfully carry out the policy it had adopted to increase its legitimate business at Augusta by securing freight on the shipments of the manufactured products of cottonseed *from* Augusta. The Supreme Court recognizes a state of war between the parties, for such profits as may accrue from handling cottonseed at Augusta (the brokerage company's profits to arise from sales and the railway company's profits to arise from freights), and calls for a fair fight. The decision of *this* court says, in effect, "You can fight if you wish, but we will first take away from one of the combatants his only weapon of defense or offense." I would have been willing, as an original proposition, to outlaw one of the combatants as being engaged in practices not sanctioned by the rules of war; but forced, as I am, by the precedent in *Central Ry. Co.* v. *Augusta Brokerage Co.,* 122 *Ga.* 646, to hold the cause of quarrel just, I am unwilling by my silence to consign one of the combatants, after stripping him of his arms, to the mercy of his antagonist.