CENTRAL TRUST COMPANY OF ILLINOIS, Trustee in Bankruptcy for the AGAR PACKING COMPANY, Bankrupt, Appellant, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellee.

**Carriers:** DISCRIMINATION IN RATES: LIMITATIONS. Actions against 1 common carriers for discrimination in rates are barred in two years, unless there has been a fraudulent concealment of the discrimination.

**Same:** INTERSTATE COMMERCE: DISCRIMINATION IN RATES. Where 2 hogs were purchased at different markets in the state and for-

warded to one central point, there unloaded, sorted and most of them reloaded and shipped to foreign states, a finding that the first shipment was merely local and did not become inter-state until the hogs were reloaded and accepted for shipment out of the state, was authorized; and the granting of an inter-state rate from the initial point to their ultimate destination, lower than the local rate to the place of unloading and re-shipment, and such hogs came into competition with those of other purchasers making only local shipments, would constitute an unjust discrimination against the local purchasers, within the meaning of the statutes prohibiting a common carrier from giving preference to any particular person.

**Same.** Where hogs were purchased especially for shipment out of the state, although assembled at a central point within the state for the purpose of sorting, reloading and determining their ulti-mate destination, their shipment at an interstate rate was not a discrimination against local purchasers who were charged a local and higher rate of transportation; as the same did not come into competition with local shipments.

**Same:** LIMITATIONS: PLEADINGS. The statute of limitations when relied upon as a defense must be specially pleaded; so that a general denial of a petition alleging that discriminations in freight rates against the plaintiff prior to the two year limitation period, were fraudulently concealed and did not come to the knowledge of the plaintiff until about the time of bringing suit, was not a sufficient pleading of the statute to raise the question of limitation.

**Same:** DISCRIMINATION IN RATES: DAMAGES: WHO MAY RECOVER. An action for damages because of alleged violation of the statutes prohibiting discrimination in freight rates is *ex delicto* and not *ex contractu;* so that a purchaser of live stock can not recover such damages for the breach of a contract made by him for the benefit of another, but only such as he himself actually sustained. Thus where it appeared that plaintiff purchased hogs f. o. b. at his place of business, paid the freight and deducted the amount from the purchase price, presumptively at least the consignor and not the plaintiff suffered the damage from any discriminatory rates, and unless overcome by the evidence he is not entitled to recover.

Evans, J., dissenting in part.

*Appeal from Polk District Court.*—HON. JAMES A. HOWE, Judge.

TUESDAY, APRIL 9, 1912.

ACTION originally brought by the Agar Packing Company to recover treble damages from defendant for unlawful discrimination in freight rates and other violations of our statutes with reference to the duties of common carriers. The Packing Company having been adjudged a bankrupt, its trustee was substituted as plaintiff, and it is now prosecuting the action. Upon issues duly joined the case came on for trial to a jury, and at the conclusion of plaintiff's testimony the trial court, on motion of defendant, directed a verdict for defendant, and plaintiff appeals.—*Reversed in part.*—*Affirmed* in part.

*Guernsey, Parker & Miller,* for appellant.

*J. L. Parrish, Robert J. Bannister* and *J. H. Johnson,* for appellee.

DEEMER, J.—To avoid confusion, we shall call the plaintiff and appellant the "Packing Company," and the defendant and appellees, the "Railway Company." The action is brought to recover treble damages from the railway company by reason of its demanding, charging, collecting, and receiving from the packing company, in the form of charges for freight in the transportation of hogs, a greater compensation than it required from other persons for like and contemporaneous service, to the prejudice and disadvantage of the packing company. It claimed:

That during the perod between the 1st day of May, 1901, and the 7th day of July, 1906, the plaintiff purchased seven thousand seven hundred and thirty-six cars of hogs and shipped the same over the railroad of the defendant to the city of Des Moines, to be converted into manufactured products at its packing house in said city. That the station from which each of said shipments was made, the weight of each such shipment and the freight rate per

hundred pounds in cents exacted by the defendant on account of each such shipment, and the amount paid as freight by the plaintiff on each of the shipments in question are all shown in 'Exhibit A,' attached to the petition and made a part thereof, and that the total amount of freight so paid during said period was the sum of $116,943. That during the period from May 1, A. D. 1901, until about March 15, A. D. 1903, one Frank Dodson, and from on or about March 15, 1903, until on or about July 20, A. D. 1905, a firm known as Compton & McRae were engaged in buying hogs in the territory in which the stations named in said Exhibit A are located, in competition with the plaintiff, for shipment to Valley Junction, a station on the line of defendant's railroad five miles west of the city of Des Moines, and that said Frank Dodson and Compton & McRae were so purchasing hogs during the period aforesaid, in competition with the plaintiff, at the stations in question, in the same markets in which the plaintiff was making its purchases and at the same times that the plaintiff was making its purchases in said markets. That all shipments made of hogs purchased by plaintiff from points on the line of the defendant's railroad north and west of Des Moines, to Des Moines, were transported through Valley Junction over the same route over which shipments of hogs from the stations last referred to, to Valley Junction, for Frank Dodson and Compton & McRae, were carried; the latter shipments terminating at Valley Junction, while the former continued to Des Moines. That the said hogs so purchased by said Frank Dodson and Compton & McRae and shipped to Valley Junction were resold by them to purchasers thereof doing business at places other than the city of Des Moines. That after said stock had been resold said Frank Dodson and Compton & McRae were accustomed to reship the same to the purchasers thereof, over the defendant's railroad and its connections, where the point of destination was beyond the lines of defendant's railroad. That the defendant entered into and maintained, during the said period aforesaid, a secret agreement whereby, by the use of various devices, it remitted and rebated to them the entire freight on the hogs so purchased by said Frank Dodson and Compton & McRae, and shipped by them to said Valley Junction,

and at the same time and during the same period the defendant required the plaintiff to pay the full tariff rates on its shipments made at the same times, from the same stations, and over the same lines.

That on or about the 20th day of July, A. D. 1905, the said Compton & McRae ceased doing business at said Valley Junction, and thereupon one J. S. Compton, *as agent* for John P. Squires & Company, which, as plaintiff is advised and believes, is one of the subsidiary corporations of Swift & Co., engaged in the business of buying hogs at the said Valley Junction, and continued so to do until on or about the 7th day of July, A. D. 1906. That during the said period the said Compton was engaged in buying hogs in the territory in which the stations named in said Exhibit A are located, in competition with the plaintiff, for shipment to said Valley Junction, and that the said J. S. Compton during the period when he was engaged in the said business at said Valley Junction was so purchasing hogs in competition with the plaintiff at the stations in question, in the same markets in which the plaintiff was making its purchases, and at the times that the plaintiff was making such purchases in said markets. That all shipments made of hogs purchased by the plaintiff from points on the line of defendant's railroad north or west of Des Moines, to Des Moines, were transported through Valley Junction over the same route over which shipments of hogs from the stations last referred to, to Valley Junction, purchased by said J. S. Compton, agent as aforesaid, were carried; the latter shipments terminating at Valley Junction. That the said hogs so purchased by the said J. S. Compton, agent, and shipped to Valley Junction, were some of them shipped by him to the said J. P. Squires & Co. in Boston, Mass., and were some of them shipped by him to other places for sale, or resold by him and shipped by him to the purchasers thereof from said Valley Junction; such shipment in each instance being made over the lines of railroad of the defendant and the lines of its connections, where the destination of the shipment in question was beyond the lines of the defendant. That the defendant entered into and maintained, during the period aforesaid, a secret agreement whereby, by the use of various devices, it remitted

and rebated the entire freight on hogs so purchased by the said J. S. Compton, as such agent, and shipped by him to said Valley Junction; and at the same time and during the same period the defendant required the plaintiff to pay the full tariff rates on all of its shipments made during the said period, from the same stations and over the same lines, to the city of Des Moines. That the secret rates and rebates given by the defendant company to the said Frank Dodson, Compton & McRae, and to the said J. S. Compton, agent as aforesaid, were concealed by the defendant from the plaintiff during the entire period, and plaintiff did not learn of such agreement until some time in the fall of the year A. D. 1905, and that during the period that said secret rates and rebates were so given the defendant at all times asserted to the plaintiff and pretended and maintained that it was not giving any rebates to the said Frank Dodson or to the said Compton & McRae or to the said J. S. Compton, agent, or to any other shipper shipping in competition with the plaintiff and asserted and pretended and maintained that it was not in any manner making any concessions from its tariff rates to the said Frank Dodson or to the said Compton & McRae or to said J. S. Compton, agent, or to any other shipper shipping in competition with the plaintiff.

That the defendant never published any tariff establishing the rates given by the defendant to the said Frank Dodson and to the said Compton & McRae and to the said J. S. Compton, agent, and, as the plaintiff is advised and believes, never gave the said rates to any person other than the said Frank Dodson, Compton & McRae, and J. S. Compton, agent. That the privileges and rebates granted by the defendant to the said competitors of plaintiff constituted and were a violation of the provisions of sections 2124 and 2125 of the Code of Iowa, and by giving the same the defendant demanded, collected, and received from the plaintiff a greater compensation for the services rendered by the defendant to the plaintiff in the transportation of property than it charged, demanded, collected, and received from the said Frank Dodson, Compton & McRae, and J. S. Compton, agent, hereinbefore referred to, for a like and contemporaneous service in the transportation of a like kind of traffic, and thereby unjustly discriminated

against this plaintiff. That the acts and doings of the defendant hereinbefore set out constitute and were a giving of preference and advantage to the said Frank Dodson, Compton & McRae, and the J. S. Compton, agent, and subjected the plaintiff to prejudice and disadvantage, in violation of the statutes of the state of Iowa. That the acts and doings of the defendant in the premises constituted and were a discrimination against the city of Des Moines, where the industry of the plaintiff is and was at the times herein mentioned, located, and subjected the said city to prejudice and disadvantage, in that it discriminated against and embarrassed the plaintiff in the conduct of its business in the said city. That on or about the 15th day of August, A. D. 1906, the plaintiff demanded of the defendant the money damages sustained by plaintiff on account of which this action is brought, and that said demand was made more than fifteen days prior to the institution of this action, and that the defendant has failed and refused to pay the amount so demanded of it by the plaintiff.

The answer to this was a general denial of each and every allegation. It was upon these issues that the case was tried, and, as a verdict was directed for the defendant at the close of plaintiff's testimony, we must assume each and every fact which the evidence tends to prove as fully established. The defendant railway operates a line of railroad from Chicago to Omaha, Neb,. and other points and has branch lines running from points west of Des Moines into territory west and northwest from that point. It has feeding and watering yards at Valley Junction, Iowa, a town near Des Moines, and is engaged in interstate and intrastate traffic. During the time in question it was defendant's custom to move hogs from all points west from Des Moines in single-floored cars, ship them to Valley Junction, there permit them to be unloaded, fed, sorted, and reloaded into double-decked cars for shipment to points east of the Mississippi river. This arrangement was an economic one, profitable to both shipper and carrier, for more hogs could be loaded into a double-

decked than into a single-floored car. It is claimed by plaintiffs, however, that upon all cars of hogs from the territory in question shipped to Agar & Co. it charged the Iowa distance tariff, and that upon hogs shipped from this territory and afterward sent forward to eastern points it made no charge from points west of Des Moines, to Des Moines, although it admits that defendant charged the full interstate rate from the point of origin to the ultimate point of destination. There was no packing house at Valley Junction, but certain persons established themselves there and during the years in question either for themselves or as agents for others purchased hogs at various places in western and northwestern Iowa, which were consigned to Valley Junction, Iowa, there unloaded, fed, sorted, reloaded in double-decked cars, and as a rule forwarded to points outside the state. A few cars were consigned to local points in Iowa after the arrival and sorting of the hogs at Valley Junction, and a few of these were shipped to the packing company in Des Moines. Upon all these intrastate shipments local distance rates were charged and exacted, and these shipments are not complained of. There were two methods of handling the hogs at Valley Junction. From May 1, 1901, to May 15, 1904, except for a period of about seven months when no hogs were purchased, the freight rate on interstate shipments being the same from Valley Junction east as from all points west and north of Des Moines to the Missouri river, no freights were in fact exacted on the shipments made to the Valley Junction parties on shipments in Iowa over defendant's line of road from points west and northwest from Des Moines; the arrangement being as follows: Waybills were issued on these shipments to the parties at Valley Junction at intrastate or distance rates; but these were not taken into account. When the cars were reloaded at Valley Junction for shipment east of the Mississippi river, they were rebilled to the point of

ultimate destination at the interstate rate, which was the same from Valley Junction as from the point of origin, and although the agent at Valley Junction was charged with the distance rate from point of origin to Valley Junction, this was all rebated and credited to him in this manner: At the end of each month the Valley Junction Railway agent sent to the auditor of the railway company a claim for shortage in his account, which consisted of the difference between the amount he had charged and the amount he had collected from the Valley Junction shippers; this difference being, of course, the Iowa distance tariff rate from all points of shipment within the Valley Junction zone to Valley Junction. These Valley Junction shippers surrendered the original expense bills covering the initial shipment from point of origin to Valley Junction, and these were forwarded to the railway company as vouchers sustaining the claim for relief. A relief voucher was then sent by the railway company to its Valley Junction agent, and he credited himself upon his books with the amount thereof as against the charges made against him because of the initial shipment from point of origin to Valley Junction. Some of the witnesses testified that the railway company collected from the final consignees of the hogs the regular tariff rate from the point of origin to final destination, and this was true in this sense: That the regular interstate rate from point of origin to point of ultimate destination was exactly the same as from Des Moines. As a matter of fact, however, the hogs came from point of origin to Valley Junction in single-decked cars and were reloaded and shipped to point of ultimate destination outside the state in double-decked ones. This practice ceased in 1904, and from and after July 23, 1904, a new system was inaugurated by the railway company. Under this arrangement the hogs were billed locally from points of origin to Valley Junction on the Iowa distance rates, and this rate was in all cases paid to the agent of the railway

company at Valley Junction by the consignees at that point, and when reloaded at Valley Junction and rebilled to points outside the state, the full interstate rate from point of origin to ultimate destination was charged, but credit given thereon for the amount already paid by the Valley Junction consignees on the original billing.

One of the witnesses gave the following explanation of the transaction:

During this period the hogs were billed locally to Valley Junction and the freight charges collected from the originating points to Valley Junction. . . . From Valley Junction, the hogs were shipped to East Cambridge. They were billed from us to Hammond, Ind.; destination East Cambridge. This was not true as to all of the hogs. In some cases, but not a great many, the heading of the bill was changed to read to Des Moines to Chicago. . . . In billing from Valley Junction to East Cambridge, we took weight enough from the weight in to make two double-decks out of three single decks, and the freight rate from the originating point to Valley Junction was deducted from the through rate to Hammond, Ind., which would be from Booneville, say, to Valley Junction, six cents, and the rate from Valley Junction to Hammond would be twenty-three cents. We should deduct six cents and bill them at seventeen and one-half cents. This same practice was pursued in reference to collection of freight charges during this entire period. . . . In all instances I collected the Iowa distance tariff rate to Valley Junction, and in all instances I billed the hogs out for the balance of the through rate from the point of origin to the point of destination. In most instances the hogs were bought in territory where the rate to the point of destination was the same from Valley Junction as from the point of origin. I think there is a change west of Neola. I do not remember an instance where the rate from the point of origin exceeded the rate from Valley Junction. If the hogs went to Chicago, I did no collection. . . . If a car of hogs, for instance, from Dexter was sent to Chicago, I simply diverted the shipment . . . and changed the billing to read Union Stockyards instead of

Valley Junction. . . . When the hogs came into Valely Junction, they were always unloaded. I could not say that where the shipments went forward on the corrected bill the identity of the shipment was maintained.

The Valley Junction agent merely accumulated the waybills on the in-shipments and credited the weight and local freight collected, upon waybills issued by him on outgoing shipments, wholly without regard to the question as to whether the hogs in the outgoing shipments were the same as those contained on the incoming shipment for which he has given credit. In other words, it appears without controversy that local freight in on hogs from, for example, Winterset or Patterson, on the south branch, would be applied as a credit on outgoing shipments from Valley Junction of hogs which had actually been received from some point west on the main line, such as, for example, Atlantic, Stuart, or Dexter, and *vice versa*. When it was determined that hogs were not available for shipments east, and a carload of them had accumulated in the yards at Valley Junction, which it was desired to send to Chicago, or to Ottumwa, or Des Moines, or south Omaha, a waybill would be taken, say, for instance, one covering a shipment from Payne & Co. at Adair, and consigned to Compton & Abbot at Valley Junction, and on this waybill Valley Junction would be changed to Chicago, Payne & Co. would be changed to Compton & Abbot, and the name of the consignee in Chicago would be changed, and the number of the car would be changed, and this car of hogs which did not come in from Payne & Co. would be sent upon this waybill to Chicago, so that Compton and Abbot, instead of paying the regular rate into Valley Junction, and then the rate from there to Chicago, paid simply the rate from Adair to Chicago, equal to the rate from Valley Junction to Chicago. Of course, the packing company had to pay local distance rates on all shipments made by it over defendant's line,

in Iowa, and it is because of this fact that it claims to have been discriminated against, and it asks to recover three times the amount of the freights paid by it for hogs delivered at its plant during the time the above arrangements were in force. As a matter of fact, while the packing company paid these freights to the defendant company, it almost invariably deducted the amount it paid from the purchase price of the hogs and sent the balance to the shipper; for the reason that under its contract with the shippers the hogs were to be delivered f. o. b. Des Moines. One of the agents of the packing company testified that he made complaint to an agent of the railway company of these practices and we here quote from his testimony, as follows:

I told him (Eberhart) that we were at a disadvantage in buying our hogs here as against the people in Valley Junction. . . . I told him that there was freight on hogs coming into Des Moines and none on hogs coming into Valley Junction, and that a shipper could sell at Valley Junction at a given price and net as much at his shipping point as if he had sold in Des Moines at the same price that he had sold in Valley Junction, plus the freight from the originating point to Des Moines.

In the record we also find this letter from one of the railway agents to another:

I have had a traveling man look into the situation carefully at a few of the points west of Valley Junction, and the shippers advise him that the prices offered by the Valley Junction parties enable them to pay practically the same price for hogs at the shipping points, that Agar can offer at Des Moines. Another feature in favor of the Valley Junction market is that at that point, on arrival, they are allowed feed and water before weighing and are charged only with the cost of the feed; while with shipments going to the Agar Company at Des Moines they are allowed no fill whatever and shippers are charged with local freight from shipping point to Des Moines.

One of the important questions in the case is the situation and relations of the parties who handled the hogs at Valley Junction. The testimony is a little obscure here, but we think it fairly appears that, during the first period to which we have referred, there were several buyers operating at Valley Junction on their own account. They purchased in their own names from those who raised or controlled the hogs at point of origin. They were billed from point of origin by these shippers to the parties at Valley Junction upon local waybills. The rate fixed was the Iowa distance tariff. The minimum weights under the local law were used in fixing the rates, and when reloaded and reshipped the waybills were from Valley Junction to the point of ultimate destination, and the rate was the Valley Junction rate, although this was the same as from point of origin.

One witness testified as follows regarding the alleged reconsignment at Valley Junction: "There is an entry in August, 1902, pro book No. 19, Grand Junction, and then in red ink the heading is changed to Des Moines, Iowa, and the weight, the rate, the local and total are scratched out. I do not remember what that was changed for. I presume it was something that was reconsigned, but what it was I don't know. Then under March, 1903, pro No. 149, there appears Prairie City, with the rate, local and total, scratched out, and in lieu thereof written in 'forward, etc.' That is the way we entered up that reconsigned shipment. These were instances of true reconsignments, and show that in such instances no account was kept at Valley Junction of the weight, rate, etc. Whereas, with reference to the hogs shipped in by Compton, Dodson, et al., the record was kept complete, the same as was done in the case of household goods or merchandise of any sort consigned to some person in Valley Junction, its ultimate destination."

Again, it was shown that during this first period the

shipper at point of origin stood the loss on crippled, injured, and dead hogs, while in transit. Again, and more important that any fact so far noted, these various buyers at Valley Junction, while reshipping the hogs to eastern and other markets, paid for the hogs from their own funds before they were reconsigned or reshipped, and, whatever the profit, it was received by the buyers, and if there was any loss it was suffered by them. None of them were bound to ship the hogs received by them to any particular buyer. These Valley Junction buyers also stood all losses on the hogs during shipment from Valley Junction to point of final destination. The operations during the second period to which we have referred were quite different.

During the second period referred to, the hogs were purchased by the Valley Junction operators as agents for Squires & Co. of. East Cambridge, Mass. They were paid for by checks signed by Squires & Co., were shipped to Valley Junction either to these parties as agents or to Squires & Co., and were sorted, reloaded, and shipped to Squires & Co. either at East Cambridge or to Chicago. The hogs were purchased f. o. b. point of origin and shipped subject to Valley Junction weights and inspection. No one had any interest in these hogs save Squires & Co., and they stood all losses in transit. None of them were consigned to points in Iowa or to any other persons save Squires & Co., and Squires & Co. paid all freight charges from point of origin to final destination, under the arrangement heretofore stated. None of the hogs were purchased either for the Valley Junction or other state markets, but all were purchased for shipment to some eastern point. They were unloaded, fed, and sorted, in order that their destination might be determined (certain grades being for particular places) and reloaded in double-decked cars for the advantage of both the railway company and the shipper. True, the exact point of ultimate destination

was not known until the re-sorting, but the actual buyers could not divert any shipments for any purpose of their own. They were acting as agents for the real buyer, and not for themselves. All the hogs which came in were accepted by Squires & Co. and paid for by them.

About July 1, 1904, the railway company entered into the following contract with one W. M. Johnston:

> That the lessor, for and in consideration of the payments to be made to it by the said lessee, and other valuable consideration, as hereinafter mentioned, has let, demised and leased unto the said lessee, for a term of one year from the date hereof, and thereafter until sixty days' notice in writing shall have been given by either party . . . the stockyards owned by the lessor located at Valley Junction, county of Polk and state of Iowa. The lessor agrees to protect the through rates from original points of origin to final destination as given when shipped out of Valley Junction on all hogs handled through said stockyards. The said lessee agrees to pay local rate on all shipments to said stockyards which are not reshipped, weight settlement to be checked up monthly and adjusted by the said lessee, paying to the said lessor the local rate on any loss between the original weights into Valley Junction, Iowa, and the weights of shipments out; and further, any shipments originating east or south of Des Moines, Iowa, on the main line of the Keokuk and Des Moines Division of the said lessor's railway, and lessee will pay local rate to Valley Junction, to final destination.

The Johnston named in this contract was an agent of Squires & Co., and Johnston afterwards assigned this contract to one Fay, another agent for said company. Very often after the hogs had been delivered to the railway company at place of origin, the destination was changed while en route by changing the waybill and readjusting the rate. As heretofore noted, local distance tariff rates were charged and collected on all shipments made during the second period and credited on the through rate, when ultimate point of destination was determined upon, and

the total rate was concededly the interstate rate from point of origin. In 1904 the packing company made complaints to the railway company of discriminations, and as a result thereof the following contract was entered into between them: "Agar Packing Company. Commencing with June 1, 1904, eastern shipments via Chicago and Chicago proper rate in and out to be equalized on outbound product, as follows: First. Find average rate on in shipments. Second. Actual earnings on outbound shipments. Add average rate inbound shipments and refund excess about twenty-three and one-half cents to Chicago less $3.00 per car on outbound cars." And in October of the same year they made the following agreements: "Memo.—On live stock purchased at Omaha and shipped over this company's rails into Des Moines and then in shape of products or live stock to Chicago or points beyond Chicago if it pays to Chicago the Chicago rate as outlined below: Charge not to exceed in and out of Des Moines, twenty-three and one-half cents plus $3.00, switching at Des Moines, plus any additional switching that may be incurred at Omaha or South Omaha. The twenty-three and one-half cents referred to above to effect delivery to any point on our tracks in the city of Chicago or stockyards. The same adjustment to apply on live stock both west of Des Moines and handled at that point to Chicago, as outlined above; the understanding being to give line between Des Moines and Council Bluffs same privilege as the 'Omaha.' October 1, 1904."

It need only be added that under these contracts the packing company received between $10,000 and $20,000 in rebates. Although the record is very large, the foregoing facts are practically conceded and are regarded as sufficient for a determination of the questions presented. The action is brought under sections 2124, 2125, and 2130 of the Code, which, so far as material, read as follows:

If any common carrier subject to the provisions of

this chapter shall directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered . . . in the transportation of . . . property . . . than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic, such common carrier shall be guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful. (Code, section 2124.) It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any prejudice or disadvantage in any respect whatsoever. (Code, section 2125.) In case any common carrier subject to the provisions of this chapter shall do, cause, or permit to be done anything herein prohibited or declared to be unlawful, or shall omit to do anything in this chapter required to be done, it shall be liable to the person or persons injured thereby for three times the amount of damages sustained, together with costs of suit, and a reasonable attorney's fee to be fixed by the court, on appeal or otherwise, which shall be taxed and collected as part of the costs in the case. . . . (Code, section 2130.)

The remedy provided in section 2130 applies to discriminations and, as will be noted, is given "to person or persons injured thereby." The primary question for consideration, then is: Was there a discrimination by the carrier against the packing company in the matter of freight rates? And the secondary one is: Was the packing company injured thereby, and, if so, to what extent? Another incidental question is this: Is the action or any part of the items sued for therein barred by the statute of limitations?

It is plaintiff's theory that the packing company

is entitled to recover all freights paid by it during the time covered by the petition, because the favored shippers paid nothing on like shipments here in Iowa.   Such actions as this are barred within two years, unless fraudulently concealed, etc.

1. CARRIERS: discrimination in rates: limitations.

It becomes necessary, in settling the primary question, to differentiate between the two different arrangements under which the shipments in question were made and to determine whether or not the shipments to the favored shippers were local or interstate in character.   If the shipments were interstate in character, then plaintiff's counsel practically concede that there can be no recovery because, although the rate charged for that part of the haul in Iowa was less than the local distance tariff, still there was no unlawful discrimination. It is necessary, then, in the first instance, for plaintiff to show that there were two shipments instead of one, and that the first shipment covered the same territory in which the packing company was operating, and applied to like shipments to those made by the plaintiffs.   Upon this proposition we think that there was enough testimony to take the case to the jury.   A jury would have been authorized to find that under the first arrangement the railway company transported hogs to parties who were buying in the local market at Valley Junction, for nothing or without any charge being made for the haul, while at the same time exacting local distance rates from the packing company upon substantially similar shipments.   The mere fact that these local buyers sorted the hogs and afterward shipped the bulk thereof on their own account to persons outside the state does not change the rule.   The shipment did not become interstate until the hogs were accepted by the railway company at Valley Junction for shipment outside the state.   The unloading at Valley Junction

2. SAME: interstate commerce: discrimination in rates.

and the reshipping from that point did not change the rule, although these local buyers intended to make the bulk of the shipments from Valley Junction to some point outside the state. The fact that the rate would have been the same had the shipment been made from the point of origin to the ultimate destination of the hogs does not change the rule; for in the one case the buyers were in direct competition with the packing company at Valley Junction and at any other point in the state to which shipments might be made by them. Appellees counsel practically concede that if there were two shipments, one from point of origin to Des Moines and the other from Des Moines to some point without the state, then there was a discrimination against all buyers at the Valley Junction market or elsewhere where they were thrown into competition with these buyers at Valley Junction. These views find support in the following, among other cases: *Gulf Ry. v. Texas,* 204 U. S. 403 (27 Sup. Ct. 360, 51 L. Ed. 540); *Coe v. Errol,* 116 U. S. 517 (6 Sup. Ct. 475, 29 L. Ed. 715); *Penn R. Co. v. Knight,* 192 U. S. 21 (24 Sup. Ct. 202, 48 L. Ed. 325); *General Oil Co. v. Crain,* 209 U. S. 211 (28 Sup. Ct. 475, 52 L. Ed. 754); *Augusta Co. v. Railroad,* 5 Ga. App. 187 (62 S. E. 996); *State v. Mo. Pac.* 81 Neb. 15 (115 N. W. 614); *Ala. Ry. Co. v. Mississippi Com.,* 203 U. S. 496 (27 Sup. Ct. 163, 51 L. Ed. 289); *Ala. Co. v. Com.,* 86 Miss. 667 (38 South. 356). We shall not take the time to quote from these cases, as they are available to the profession in general and are in line with our conclusions.

II. As to the shipments made during the second period, we are quite as well convinced that they were interstate and not discriminatory in character. True the ultimate destination was not known until the

3. SAME.

arrival and sorting of the hogs at Valley Junction; but they were all destined to points outside of the state and were accepted by the carrier with this

understanding.   The unloading, sorting, and reloading was to. determine the exact point of ultimate destination and to get the advantage of the double-decked cars.   The hogs were at all times purchased for and belonged to Squires & Co., and they could not be diverted to points within the state or delivered to any one other than Squires & Co. or to persons authorized by them to receive them.   These shipments were not made under the same or similar circumstances to those made by the packing company, the sales to the ultimate purchaser were not in competition with it, and, so far as shown it, the packing company had no interstate shipments of live hogs to make in competition with Squires & Co. and was not at any time denied the same rates for like shipments.   Moreover, under its two contracts for rebates on shipments made of the finished product to eastern markets, the rates were equalized and the packing company was placed at no disadvantage on its manufactured goods in the markets where it came in competition with Squires & Co. or other eastern packers. The arrangement at Valley Junction was a sort of milling in transit agreement, which had been upheld not only by the Interstate Commerce Commission, but by the courts as well.   See, as sustaining these views:   *Laurel Cotton Co. v. Railway Co.*, 84 Miss. 339 (37 South. 134, 66 L. R. A. 453); *Central Pine Assn. v. Railway Co.*, 10 Interst. Com. R. 193; *In re Unlawful Rates*, 8 Interst. Com. R. 121.

As sustaining the proposition that the rates were not discriminatory, see:   *I. C. C. v. Ala. Ry. Co.*, 168 U. S. 144 (18 Sup. Ct. 45, 42 L. Ed. 414); *Texas R. R. v. I. C. C.*, 162 U. S. 197 (16 Sup. Ct. 666, 40 L. Ed. 940); *I. C. C. v. B. & O. R. R.*, 145 U. S. 263 (12 Sup. Ct. 844, 36 L. Ed. 699); *Parsons v. Railroad*, 167 U. S. 447 (17 Sup. Ct. 887, 42 L. Ed. 231); *Conan v. Bond* (C. C.) 39 Fed. 54; *Knudsen v. Railroad Co.*, 148 Fed. 974 (79 C. C. A. 46).   We shall not stop to

quote from these cases, for they announce well-settled rules of law upon the question of discriminations. This conclusion eliminates all shipments made under the second arrangement to which we have referred.

III. The railway company contends, however, that action for recovery of damages for discriminations under the first arrangement is barred by the statute of limitations, and this is no doubt true, had the railway company pleaded the statute. This it contends it did, but we find no such plea. It is true that plaintiff, the packing company, presumably perhaps to save its petition from a demurrer, averred that the discriminations practiced against it prior to October, 1904, were fraudulently concealed and did not come to its knowledge until about the time of the bringing of this suit. The only answer to the petition was a general denial. Nothing was said about the statute of limitations. Now, under this general denial the plaintiff was not required to prove more than under the issues would give it a *prima facie* right to recover, no matter what it may have charged in the petition. Code, section 3639, and cases cited thereunder. Again, allegations as to time are not as a general rule material, and plaintiff may prove any other date. Code, section 3613, and cases cited. If one would rely upon the statute of limitations, he must specially plead it. *Tredway v. McDonald,* 51 Iowa, 663; *Jenks v. Lumber Co.,* 97 Iowa, 342; *McDonald v. Bice,* 113 Iowa, 44; *Belken v. Iowa Falls,* 122 Iowa, 430; *Borghart v. Cedar Rapids,* 126 Iowa, 313. Again, section 3563 of the Code provides that, "when any of the matters enumerated as grounds of demurrer do not appear on the face of the petition, the objection may be taken by answer," and in *Robinson v. Allen,* 37 Iowa, 27, it is said that, if the statute of limitations is not set up in the answer, it can not afterward be relied upon. Defendant says that to do more than it did would amount to nothing

4. SAME: limitations: pleadings.

more than stating a conclusion of law. While it may be
that such a pleading would be conclusion of law from facts
pleaded or admitted, yet as applied to certain defenses as
the plea of the statute of limitations a conclusion is proper
pleading. If raised by demurrer it is a conclusion, and if
the petition is not vulnerable to a demurrer the statute
expressly says that the *objection* may be taken by answer.
Without a plea of the statute plaintiff was not required to
prove the alleged fraudulent concealment, for it was not
necessary to entitle it to recover unless the plea of the
statute was interposed. We do not think the answer
sufficiently raises the bar of the statute of limitations.

IV. But one question remains, or rather two questions involved in the one: Was the packing company injured by the discriminations under the first arrangement,
and, if so, to what amount? The action is
5. SAME: discrimination in rates: damages: who may recover.
not *ex contractu* but *ex delicito,* and the packing company, if it recovers at all, must do so
in its own right and not because it made a
contract in the name of or for the benefit of another who
was damaged by the breach of that contract. The action is
not for the benefit of another, but to recover three times
the amount of damages sustained by it as the injured party.
On the one hand, it is contended that, as the packing
company paid the freight on hogs shipped to it during the
time covered by the first period, it is entitled to the full
amount of the freights paid by it from the common territory, and that this should be trebled. On the other hand,
the railway company contends that as the hogs which were
shipped to the packing company were f. o. b. Des Moines,
the shipper paying the freight or in all cases suffering the
amount thereof to be taken from the purchase price before
it was remitted by the packing company to the shipper,
the packing company sustained no loss; that the loss was
the shipper's and that, if plaintiff is permitted to recover,
the railway company might again be held liable to the

shippers. Although the record is very voluminous and covers practically every point in the case, there is no proof that the packing company had to pay the original shipper more for his hogs because of the f. o. b. Des Moines shipment than its competitors were paying during the first arrangement. We can not assume without proof that such were the facts. The competitors at Valley Junction may have had this much more profit, paying no more for the •hogs at place of shipment than the packing company even where the shipper paid the local freight, but the question is: Is this loss of profits the measure of plaintiff's recovery under the allegations of the petition, from which we have elaborately quoted in order that all the questions presented may be thoroughly understood. This to our minds presents the most doubtful question in the case. Few, if any, authorities are cited on either side upon this proposition.

In *Union Pacific R. R. v. Goodridge,* 149 U. S. 680 (13 Sup. Ct. 970, 37 L. Ed. 896), the court, speaking through Mr. Justice Brown, said:

The statute recognizes the fact that it is no proper business of a common carrier to foster particular enterprises or to build up new industries; but, deriving its franchise from the Legislature, and depending upon the will of the people for its very existence, it is bound to deal fairly with the public, to extend them reasonable facilities for the transportation of their persons and property, and to put all its patrons upon an absolute equality. *Scofield v. Railway,* 43 Ohio St. 571 (3 N. E. 907, 54 Am. St. Rep. 846); *Sandford v. Railway,* 24 Pa. St. 378 (64 Am. Dec. 667); *Messenger v. Pennsylvania Railroad,* 36 N. J. Law, 407 (13 Am. Rep. 457); *McDuffie v. Portland, etc., R.,* 52 N. H. 430 (13 Am. Rep. 72). So opposed is the policy of the act to secret rebates of this description, that it requires a printed copy of the classification and schedule of rates to be posted conspicuously in each passenger station for the use of the patrons of the road, that every one may be apprised, not only of what the com-

pany will exact of him for a particular service, but what it exacts of every one else for the same service, so that in fixing his own prices he may know precisely with what he has to compete. . . . The seventh and last assignment of error was to the action of the court in refusing to grant a new trial, and in entering a judgment on the verdict, because there was no sufficient evidence to support the verdict, and especially to sustain it as to the amount of damages. Plaintiff's evidence had shown that the Marshall Company had been receiving a rebate upon all coal transported by it to Denver, which was not allowed to its competitors in business, and the damages sustained by the plaintiffs were measured by the amount of such rebate, which should have been allowed to them. The question whether they lost profits upon the sale of their own coal by reason of the nonallowance of such rebates was too remote to be made an element of their damages. They were entitled to the same terms which the Marshall Company would have received, and damages to the exact extent to which the Marshall Company was given a preference.

This case seems to eliminate the question of profits. But it does not expressly decide the proposition now before us. The references made by appellant's counsel to Elliott on Railways, sections 1559 and 1692, give no aid upon this proposition, and the only case which even touches it which has been called to our attention is the *Goodridge* case, *supra*. True it is that a consignee of goods may as a general rule under the laws of this state sue the carrier for damages due to delay, injury, or destruction of the goods. *Bank v. Express Co.,* 127 Iowa, 1, and cases cited. But this is upon the theory that presumptively the consignee is the owner of the goods, title having passed to him at least inferentially upon delivery to the carrier. This of course, is a mere presumption, which doubtless may be overcome by proof. But, however that may be, it does not necessarily follow that the consignee of goods is the person injured where discrimination in rates is shown. Whether or not he is so injured may depend upon the

facts. Presumptively he is, no doubt, the person injured; but we think it is only a presumption, and that if the testimony shows he suffered no injury, no recovery may be had. The question reduced to its last analysis is primarily one of statutory construction.

What is meant by the phrase, "person injured thereby, for three times the amount of damages sustained in consequence," etc. ? Upon this proposition we have discovered some cases which, while not conclusive, throw some light upon the proper interpretation of the statute. Thus in *Atchison, T. & S. F. R. R. v. Goetz et al.*, 51 Ill. App. 151, it was held that the actual consignor of the goods might sue to recover excessive freight charges, although the bill of lading ran in the name of another.

In *Summers v. Southern Ry. Co.*, 138 N. C. 295 (50 S. E. 714), the Supreme Court of North Carolina said:

Ordinarily, in case of a shipment of goods by a railway to a person who has ordered them, on delivery to the railway the company receives them as the agent of the vendee or consignee, and such person would be the aggrieved party by delay in forwarding. But in this case, by the terms of the agreement between the plaintiff and Ward & Son, the plaintiff was not to get credit for the returned goods till they were received by Ward & Son. It made no difference to this firm whether the goods were returned or not. They had their account against the plaintiff, and a fair interpretation of the agreement between the parties is that no credit was to be given till the goods came to hand. Until this occurred, the loss of the goods would have been the loss of the plaintiff, and he alone was interested in urging the shipment.

By a statute in the state of Indiana telegraph companies were required to transmit messages impartially, and the act provided that for any violation the company should be liable to the party aggrieved in a penalty of $100. In construing this penalty clause the Supreme

Court of that state, in *Hadley v. W. U. Tel. Co.*, 115 Ind. 191 (15 N. E. 845), said:

So far as we are at present advised, this court has uniformly ruled that it was only the sender of a telegraphic dispatch who could recover the fixed penalty prescribed by section 4176 (Rev. St. 1881), *supra,* for a violation of its provisions, and in argument the correctness of these rulings is conceded.    See *Telegraph Co. v. Brown,* 108 Ind. 538 (8 N. E. 171), above cited.    But it is now sought to be maintained that, under the act of 1885 (Acts 1885, c. 48), the right to sue for and recover the fixed penalty is not restricted to the sender of the dispatch, but that the phrase 'any party aggrieved' is broad enough to include as well the person to whom, or corporation to which, the dispatch is directed, when aggrieved by a non-compliance with the requirements of that act.    In the construction of a statute authorizing the recovery of a penalty, a strict, rather than liberal, interpretation ought to be given to its provisions; and in such a case, as in others where the meaning is seemingly obscure, a resort may be had to previous legislation on the same subject.    *Telegraph Co. v. Axtell,* 69 Ind. 199; *Telegraph Co. v. Roberts,* 87 Ind. 377; *Telegraph Co. v. Mossler,* 95 Ind. 29.    It is true that the fixed penalty is imposed for the breach of a duty which telegraph companies owe to the public generally, and not as damages for the nonperformance of a contract to properly transmit a dispatch.    But such a breach of duty can not arise until after a telegraph company has either entered into a contract, or has become obligated to transmit the dispatch.    The generally accepted doctrine, both in this country and in England, has so far been that it is only the sender of a dispatch who occupied that privity of contract or relation with the telegraph company which is necessary to the maintenance of a suit for the statutory penalty.    It is to him, and only to him, as the holding has so far generally been, that the company directly assumes the obligation of sending the dispatch in the manner required, and under the restriction imposed by the law.    This is well illustrated by the case of *Telegraph Co. v. Pendleton,* 95 Ind. 12 (48 Am. Rep. 692), and the authorities there cited.    That case has been dis-

approved by the Supreme Court of the United States, in so far as it treats of certain interstate relations in telegraphy; but in all other respects it remains unimpaired. We do not feel at liberty to hold that this long and well-accepted rule of decision has been changed by the act of 1885. It is but reasonable to suppose that if the Legislature had intended to change a rule so well defined, and generally recognized by the courts, it would have done so in terms more direct and more explicit. The principal object of the first section of the act in question evidently was to protect the interests of the patrons of telegraph companies by preventing, so far as is reasonable, any discrimination between them. It is only those who give business to, and send dispatches over the wires of, a telegraph company, that can rightly be called its patrons, within the meaning of the statute. In this view, it is only those entitled to be considered as the patrons of such a company who are authorized to enforce the statutory penalty when it has been incurred. The person to whom a dispatch is sent can not, therefore, become a party aggrieved, in the sense contemplated by the act under consideration. Any other construction might result in a multiplicity of suits to recover the same penalty. See, also, *Crosby v. Pere Marquette R. R.,* 131 Mich. 288 (91 N. W. 124).

It is true that the statute now before us provides a penalty; but the penalty can not be recovered save by a party injured, and the amount is based upon the actual damages suffered by the party against whom the discrimination is made.

Our final conclusion is that the question is finally one of fact. If the consignee of the goods has shown that he suffered damage by reason of the discrimination, he is entitled to recover; otherwise not. Doubtless the presumption is that a consignee who pays the freight is the party injured; but, if the freight is finally collected from the consignor, then the presumption immediately shifts, and he is *prima facie* the party injured. Here the packing company paid the freight in the first instance; but it charged the amount thereof to the consignor's account and

deducted the same from the purchase price of the hogs. If there was any discrimination, the party presumptively injured was the shipper, who actually paid the freight.

We shall now turn to the record to discover if there is any testimony sufficient to take the case to the jury upon the proposition that the packing company was the person injured. The testimony shows that in some few instances the freight paid by the packing company was not charged back to the shipper, and as to these we think plaintiff made a *prima facie* case for recovery. We shall not undertake to state the amount, for this is not our duty. As to these, it is apparent the matter should have been submited to the jury.

One of plaintiff's witnesses stated as conclusion that the amount of freight paid by the packing company affected the price of the hogs bought by it to the amount of the in-freight; but he also said that: "The prices we made to our shippers were based on the rates at Des Moines. Take, for instance, $6.50 a hundred pounds; a car weighing 20,000 pounds would come to $1,300. If the rate in was thirteen cents a hundred, that would make $26. I would pay the freight to the railroad, and I would send the shipper a check for $1,300 less $26, and the amount that I actually paid for the hogs was the sum of these two items, or $1,300."

We find no showing as to amount per hundred paid to the shipper by the packing company, and have been unable to discover the basis for the price paid by the packing company to the shipper. Counsel for the packing company say, in their brief, that: "The freight paid was entered into and made a part of the actual cost of the hogs to the Agar Packing Company at Des Moines. This is true regardless of the fact as to whether the Agar Packing Company did or did not deduct from the remittance to the shipper the in-freight on the cargo of hogs received from him. Clearly the freight paid entered into

the value of the hogs bought by the Agar Packing Company, and entered into the cost of those hogs to that company when they were unloaded in its yards at the packing plant in Des Moines." But this is a mere deduction not based upon any showing as to the actual cost of the hogs per hundred pounds. Again, they say: "The real truth of the matter, as shown by the evidence, is that the shippers at point of origin sold their hogs to the Agar Packing Company at a price represented by the difference between the freight into Des Moines from points of shipment, and the Chicago market price of hogs, so that neither in theory nor in fact is there any foundation for the claim that Agar Packing Company did not pay the freight. We have already pointed out in our principal argument that under the statute the remedy is granted to 'the person injured,' and the evidence discloses beyond a peradventure that the Agar Packing Company was the person injured by the discrimination which the statute forbids." Assuming this to be true, it does not necessarily follow that the packing company was discriminated against; but we find no testimony that the basis of the price to the shipper was the Chicago market. No such testimony is pointed out, and we do not find it in the record. However, as there were some freights paid by the packing company which were not repaid or refunded or charged to the shipper, the trial court should not have directed a verdict. The ruling on that part of the motion relating to shipments made since July, 1904, was correct.

In closing this opinion it may not be out of place to say that, so long as interstate rates of freight are arbitrary and empirical, so long as carriers engaged in such traffic may establish traffic zones covering many miles and in some instances an entire state, and so long as local tariffs are on a distance basis, there will be discriminations not only as between shippers who make interstate shipments, but between such shippers and those who would make

local intrastate shipments.   It is conceded that the inter-state rate on hogs is the same from Des Moines or Valley Junction to various eastern points as from Council Bluffs and Omaha.   'By reason of that fact the shipper from Council Bluffs gets his hogs carried from that point to Valley Junction free of charge.   And the universal hold-ing has been that unless the consignee stops his interstate shipment at Des Moines, and brings his product in direct competition with the local buyer at that point, there is no unlawful discrimination.  Such arrangements have no doubt driven many factories and packing plants out of Iowa or have made it impossible for them to locate in this state, although near the source of raw material; and this the state is powerless to prevent.   The remedy, if there be any, is in the hands of the carriers, unless Congress sees fit to intervene and establish a distance tariff over the en-tire country.   This remedy may be entirely too drastic, and, so far as we have observed, no one has yet been so bold as to suggest this as a cure.   The equivalent of a milling in transit rate to all factories and plants seems to be the only solution, and that seems to have been given the packing company in question.

Our conclusion does not exactly agree with that of the learned district court, and from what has been said it is apparent that as to some of the items sued for the case should have gone to the jury.   As to others, plaintiffs have no right of recovery.

*Affirmed* in part, and *reversed* in part.

EVANS, J. (dissenting in part).—I want to concede that the majority opinion presents on the whole an excel-lent analysis of this voluminous and complicated case.   I agree with it in the main and am somewhat reluctant to find any fault with it.   I can not avoid the conviction, however, that we are not justified upon this record in the partial reversal of the order of the trial court.   I arrive

at this conclusion from two or three points of view which I will suggest as briefly as I can.

I. The majority opinion holds that the trial court properly withdrew from the jury all items based upon transactions subsequent to July 27, 1904. In this view I concur. For the same reason I think the trial court properly directed a verdict as to the items preceding such date. I think the substance of the arrangement under which the defendant operated was essentially the same throughout the entire period. The prominent difference in the methods employed *before* July 27, 1904, and *afterwards* was that in the latter period the Iowa distance tariff was actually *paid,* and the amount so paid was applied as a credit upon the interstate rate, whereas in the earlier period full Iowa distance tariff to Valley Junction was actually *charged,* and the amount so charged was later applied as a credit upon the interstate rate in all cases where the hogs were destined into another state. The diminution was always made upon the interstate rate and never upon the Iowa rate. Where there was no interstate rate, there was no diminution or discrimination of any kind. The essential purpose of both methods was to obtain what is termed in the majority opinion as a "milling in transit rate," for interstate shipments; the full Iowa distance tariff to Valley Junction being in all cases charged to the persons for whose benefit the shipment was made. The charge was a valid liability. There was therefore, in all cases, a period of time after the arrival of the shipments at Valley Junction where there had been no violation of the Iowa law. If there was any violation of either the state or the federal law, it arose afterward in connection with the reshipment to points without the state. Clearly, such reshipment was interstate shipment. If the interstate rate collected thereon was reduced by the amount already paid or charged as the Iowa distance tariff, the legality of such act must be determined under the fed-

eral statute and not under the Iowa statute.   There is one feature of the record at this point which has not received mention in the majority opinion.   All the interstate shipments made from May, 1901, to August, 1902, were made pursuant to an arrangement between the defendant and Kingan & Co. of Indianapolis.   So far as the defendant is concerned, the arrangement between it and Kingan & Co. was precisely the same as that entered into with J. P. Squires & Co. in 1904.   Frank Dodson was the purchasing agent for Kingan & Co. for the period mentioned, whereas Compton was the purchasing agent for Squires & Co.   The contract between Kingan & Co. and its purchasing agent was somewhat different in its terms from the contract between Squires & Co. and its purchasing agent.   However, the contract in each such case was a contract between the principal and his agent.   But the relation of the defendant railroad company was precisely the same as to each principal.   From August 17, 1902, to March 1, 1903, no hogs were shipped from Valley Junction.   From March 1, 1903, to March 1, 1904, Compton & McRae operated under the same arrangement with the defendant as Kingan & Co. had done.   They were local buyers.   But the arrangement entered into was applicable only to interstate shipments.   This arrangement was terminated March 1, 1904.   From that date no hogs were shipped from Valley Junction until the arrangement was entered into with Squires & Co. in July, 1904.   Prior to the commencement of this suit, the plaintiff served a written demand upon the defendant in accordance with the requirements of section 2130 of the Code of 1897.   The discriminations charged in that demand were confined to those made in favor of Squires & Co. and Compton & McRae.   No complaint was made therein as to any discrimination in favor of Kingan & Co. or of Frank Dodson.

II.   It is held in the majority opinion that the plaintiff is in no position to recover as for freights paid and

*charged by it to the shipper.* In other words, that the
defendant in such a case is liable, if at all, to the person
in whose behalf the freight was paid. With this view I
agree. It is said, however, that there were some instances
where the plaintiff company paid the freight in its own
behalf, and that as to such items there should be a reversal
of the order of the trial court. I think the record before
us does not justify a partial reversal upon that ground.
Mr. Agar, the general manager of the plaintiff company,
testified as follows:

The prices we made to our shippers were based on
the rates at Des Moines. Take, for instance, $6.50 a
hundred pounds; a car weighing 20,000 pounds would
come to $1,300. If the rate in was thirteen cents a hun-
dred, that would make $26. I would pay the freight
to the railroad and I would send the shipper a check
for $1,300 less $26, and the amount that I actually
paid for the hogs was the sum of these two items, or $1,300.
The number of hogs bought on the track at the various
places of origin was small in comparison to the other
method of buying; where they were so bought, the in-
freight was paid by the plaintiff, the freight following.
It would not be advanced. It would be computed, and
we would pay it, and the price paid the shipper would be
based upon where the hogs originated, and in that instance
the cost would be made up of the two items. Exhibit
162 is what we call our account sales. The number in-
serted under the proper heading shows the number of ani-
mals. The notation '2 CRIP' means cripples. This with
the 65 is footed up to make the 67. There was one dead.
Under the 'deduct' is $2 deducted. This was probably
on account of something wrong with one of the hogs. The
price $4.15 is for the 65, for the sound hogs. For the
crippled hogs the price is $3.25. There is something
added on account of the dead hogs. This makes $815.82.
Freight is opposite the words, 'less freight,' $15.55. This
amount $15.55, the plaintiff paid the railroad, and $800.27
was remitted to the shipper. The plaintiff made no pay-
ments on account of these hogs further than the two pay-
ments that have been referred to, one to the railroad and

the other to the shipper; but it did make these two.   This illustrates the way in which the payments were made when the hogs were bought at a price at our yards.   Taking Exhibit 163, the number of hogs is 127, indicating two cars.   I do not know what the words, 'less two stopped at Valley Junction,' mean. , In this account sales, we find the memorandum, 'we pay,' and the freight is $43.61; in that case it is added.   The amount, $2,705.24, was paid by the shipper and the freight, $43.61, was paid to the railroad company.   This illustrates the way the account sales were made up, where the memorandum bore the notation 'we pay.'   These are 'the cases where the hogs were bought at a price at point of origin.

Talbot, one of the purchasing agents of the plaintiff, testified as follows:

The prices I gave them were prices delivered at Des Moines, and I bought the hogs delivered there.   Freight was deducted from the proceeds, but I do not know who paid it.   I made out a bill showing the freight deducted. The shipper does not pay it, and I don't know who does pay it unless the packing house does.   If a man shipped a carload of hogs, and we agreed to pay him 4½ cents we remitted to him on the basis of 4½ cents after deducting the amount of the freight on the hogs from the point of origin to the Agar Packing Company.

Only two instances are made to appear in this record where the plaintiff purported to pay the freight on its own account.   These two items amount to $63.   In view of the fact that this suit is brought for $350,000 upon more than 7,000 items, these two items become comparatively insignificant.   The appellant has not asked a reversal upon this ground.   There is also a feature of the record which presents a very substantial reason why a reversal should not be had for these small items.   The written demand served by plaintiff upon defendant preliminary to the suit to which reference has already been made contains the following tender of credit: "The undersigned further notifies you that the amounts heretofore paid by you to

the undersigned on account of such discrimination may be credited by you upon the amount hereby demanded; such credit is not now made by the undersigned because the undersigned is not advised of the amounts of the payments so made by you." The foregoing provision has reference to a certain contract between plaintiff and defendant in relation to interstate shipments of manufactured products which contract is referred to and set out in part in the majority opinion. It appears from the testimony of Mr. Agar that the plaintiff company received from the defendant in adjustments under this contract not less than $10,000 nor more than $20,000. This is the credit which is tendered in the written demand as above indicated. In view of this voluntary tender which appears in the record, it ought to be deemed sufficient to absorb the small items upon which liability might otherwise be predicated.

III. I am not satisfied with the discussion of the majority on the subject of the statute of limitations. I agree that the statute of limitations is an affirmative defense and must be pleaded as such. I may add that it is governed by the same statute that applies to other affirmative defenses. If the petition shows upon its face that the cause of action is barred by the statute of limitations, the plea of the statute may be interposed by demurrer. A failure to demur, however, does not waive it under our present statute, and it may be interposed by answer. If the petition upon its face does not show the cause of action to be barred, then of course no demurrer will lie. In the case before us the petition shows upon its face that a part of the cause of action would be barred by the statute of limitations except for the affirmative allegations in the petition pleaded in avoidance of such bar. Clearly a demurrer to the petition would not lie. Would an affirmative defense based wholly upon the statute of limitations lie to such petition? If so, we are driven into an illogical position. The question is governed by sec-

tions 3563, 3566, and 3629. Section 3566 provides what an answer shall contain. Only subdivision 4 thereof is applicable to the plea of the statute of limitations. It provides as follows: (4) "A statement of any new matter constituting a defense. . . ." Under this section the statute of limitations is pleadable as a distinct and affirmative defense. If the statute as pleaded does not present of itself an affirmative defense, there is no statutory provision for pleading it at all. Section 3629 provides for a defense "which *admits* the facts of the adverse pleading but by some other matter seeks to avoid their legal effect." This is confession and avoidance. Turning now to the petition, it recognized the apparent bar of the statute of limitations and pleaded affirmatively in avoidance thereof. On this question, the petition itself is in the nature of a confession and avoidance. Suppose the defendant had undertaken to plead the statute of limitations as a separate defense in its answer, what affirmative matter could it aver? It could aver that more than two years had elapsed after the accruing of the cause of action and before the commencement of this suit and that the cause of action was therefore barred. Could it be said that this plea presented a good defense against plaintiff's cause of action as pleaded in the petition? Suppose the plaintiff should demur to such division of the answer on the ground that the facts pleaded in such defense in support of the plea of the statute were fully avoided by the allegations of the petition, and that the allegations of such division of the answer presented therefore no defense to the petition. Is there any logical escape from saying that such demurrer would be good? Where a plaintiff chooses to render his petition invulnerable to a plea of the statute of limitations either by demurrer or answer, by alleging affirmative matters in avoidance thereof, he ought not to be permitted to say that the question may not be raised on the trial at the close of his evidence, if he fails to

prove the avoiding facts. Even though he fail to prove
the avoiding facts, his petition stands as invulnerable as
ever as a question of pleading. In this case the defendant
raised the question of the statute of limitations at the close
of plaintiff's evidence in the only manner logically open
to it. The petition itself tendered issue upon the avoiding
facts, and plaintiff failed to prove them. Defendant's
motion was in the nature of a demurrer to the evidence. The
failure of the evidence did not entitle him to demur to the
*petition*, for that remained as unassailable as before. If the
plaintiff had withdrawn his allegations as to fraudulent
concealment upon his failure to prove the same, a some-
what different question would be presented.

The fact remains that the plea of the statute of
limitations was specifically urged by the defendant · as a
ground for a directed verdict in the court below as soon
as the plaintiff rested its case, and that plaintiff so rested
without making any proof of the allegations which ren-
dered its petition invulnerable to that plea, either by
demurrer or affirmative defense. The majority opinion
holds, in effect, that under no circumstances can the statute
of limitations be made available in this way. To so hold
is to my mind both technical and illogical, although not
without support in authority. Nor are we required to so
hold by any mandatory provision of the statute. Nor
can I find anything in our past holdings to cover such
case as this. The majority opinion treats the allegations
of the petition charging fraudulent concealment as mere
surplusage, pleaded inadvertently or otherwise. If they
can be deemed as such, of course they need not be proved.
But it is too plain for argument that these allegations
were not pleaded inadvertently, nor can they be deemed
as surplusage. They were manifestly pleaded for the
express purpose of preventing a plea of the statute of
limitations. They served the intended purpose of the
plaintiff. On what logical theory can they be treated as

surplusage after their work is fully done? It was held in *McDonald v. Bice,* 113 Iowa, 44, that the defense of the statute of limitations "is a confession and avoidance." How could the defendant confess and avoid the petition as drawn?

In *Borghart v. Cedar Rapids,* 126 Iowa, 317, it was held that: "The bar of the statute must be made an *issue,* and it seems hardly necessary to say that a motion to direct a verdict is necessarily based on the issues as previously joined and the evidence bearing thereon. By failing to make the statute of limitations an issue in the case, that defense was waived." In the case before us, the plaintiff voluntarily tendered the issue and confined it to the avoiding facts pleaded by itself. If in this state of the pleadings we still apply the general rule that the statute of limitations must be affirmatively pleaded by the defendant, we are adopting an illogical position without any necessity for it.

Turning to the authorities, they are in much confusion on the subject of pleading in the presence of the statute of limitations. In some jurisdictions it has been held that, when a plaintiff brings his action after the expiration of a statutory period of limitation, it is incumbent upon him in the first instance to plead the avoiding facts in his petition and to prove the same on the trial. *Humphrey v. Carpenter,* 39 Minn. 115 (39 N. W. 67); *Morrill v. Little Falls,* 53 Minn. 371 (55 N. W. 549, 21 L. R. A. 174); *Westervelt v. Filter,* 2 Neb. (Unof) 731 (89 N. W. 994); *State Bank v. Frey,* 3 Neb. (Unof.) 83 (91 N. W. 239); *Newman v. Linderholm,* 68 Neb. 364 (94 N. W. 617). On the other hand, it has been held in other jurisdictions that it is not proper to anticipate in the petition the defense of the statute of limitations; and that, if avoiding facts be pleaded in the petition, they will not avail the plaintiff, but that the same, in order to be available, must be pleaded in the reply. *Concannon v. Smith,* 134

Cal. 14 (66 Pac. 40) ; *Wall v. Chesapeake,* 200 Ill. 66 (65 N. E. 632) ; *Gunton v. Hughes,* 181 Ill. 132 (54 N. E. 895). In some jurisdictions it has been held that the plea of limitations can not be interposed by demurrer where the statute provides that it shall be raised by answer. *Satterlund v. Beal,* 12 N. D. 122 (95 N. W. 518) ; *Hedges v. Conger,* 10 N. Y. St. Rep. 42 ; *Grogan v. Valley Co.,* 30 Mont. 229 (76 Pac. 211). In other jurisdictions it has been held, under a like statute, that the term "answer," as used in the statute, will be construed to include any pleading presenting an issue of fact or law, and that the plea of limitation may therefore be interposed either by answer or demurrer or by a *special exception.* *Hopkins v. Wright,* 17 Tex. 30 ; *Smith v. Fly,* 24 Tex. 345 (76 Am. Dec. 109) ; *Howell v. Howell,* 15 Wis. 55 ; *Motes v. Gila Valley,* 8 Ariz. 50 (68 Pac. 532) ; *Rivers v. Washington,* 34 Tex, 267 ; *Sheldon v. Keokuk & Northern* (C. C.) 8 Fed. 769. There are many exceptional cases wherein the general rule as to pleading the statute of limitations has been held nonapplicable. These are cases where the defendant is found not to be in fault in failing to plead the statute. *Dreutzer v. Baker,* 60 Wis. 179 (18 N. W. 776) ; *Nelson v. Cooper,* 108 Fed. 919 (48 C. C. A. 140) ; *Gottschall v. Melsing,* 2 Nev. 185 ; *Dean v. Tucker,* 58 Miss. 487 ; *Bromwell v. Bromwell,* 139 Ill. 424 (28 N. E. 1057) ; *Smith v. Cuff,* 3 Nova Scotia, 12.

In the last case cited, the court refused to enter judgment against a defaulted defendant served by publication, upon a claim which appeared on its face to be barred by the statute of limitations. As will be seen from the examination of the foregoing authorities, the subject of pleading as relating to the statute of limitations has been churned into much confusion and inconsistency. This is to be accounted for in part by the fact that in an early day the courts were disposed to look upon the defense of the statute of limitations as unconscionable. They there-

fore throttled it when they could and treated it as fully waived unless the defendant set it up promptly and accurately. It was not permitted to set it up even by amendment. This condemnation has long ago passed away, and this defense is now recognized as having its own substantial merit. But the old precedents have continued to obtrude themselves into the decisions, and this has resulted in excessive technicality without any apparent reason therefor. There is nothing in, our own statute nor in our previous decisions which puts this defense in dishonor or subjects it to any rule which is not applicable to any other affirmative defense.

There is a further consideration at this point that ought not to be overlooked. We are awarding a partial reversal as to a few items. We are holding also that these items are in truth barred by the statute of limitations, but that the defendant has failed to claim the benefits of the statute in a proper way. The case must therefore be remanded to the trial court for further hearing. Will not the defendant then be entitled to avail itself of the statute of limitations by appropriate amendment? Must we now close our eyes to the self-evident and go through the mere form of a reversal in order to maintain a hard and fast rule as to the method of pleading the statute of limitations?

In view of the implied confession and avoidance pleaded in the petition, I think the defendant should be deemed to have sufficiently raised the plea of the statute of limitations by his motion at the close of the evidence, and that the plaintiff was in no manner prejudiced by the method adopted.